

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00333-CV

IN THE INTEREST OF B.M.H.,
H.M.H., AND A.M.E., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant A.K.P. (Mother) appeals the trial court's order terminating her

parental rights to her children, B.M.H. (Billy), H.M.H. (Heather), and A.M.E

(Adam).[2]  In one issue, Mother argues that the evidence is legally and factually

---

[1]*See* Tex. R. App. P. 47.4.

[2]To protect the anonymity of the children, we will use aliases to refer to them and to other people associated with this appeal.  *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2013); Tex. R. App. P. 9.8(b)(2); *In re K.N.*, No. 02-13-00062-CV, 2013 WL 3325104, at *1 n.2 (Tex. App.—Fort Worth June 27, 2013, no pet.) (mem. op.).

insufficient to prove that termination of her parental rights is in the children's best interest.  We affirm.

## Background Facts

Mother gave birth to Billy in June 2002, to Heather in December 2003, and to Adam in July 2008.  M.H. (Michael) is Billy and Heather's father.  Mother was once married to Michael, but they divorced in 2004 after his infidelity.  In October 2008, Mother married Z.P. (Zeth), who fathered Adam.

Mother, who was thirty-two years old during the trial, has a history of using illegal drugs.  She began smoking marijuana when she was fourteen years old.  At about eighteen years old, Mother once smoked marijuana with her mother, G.B. (Glenda).  She progressed to using cocaine and methamphetamine when she was in her early twenties.  When Mother was twenty-three or twenty-four years old, after her divorce from Michael and after Billy and Heather had been born, she used methamphetamine three to five days per week, spending about $20 per day for the drug.

During that time, by Mother's admission, she was not as attentive to the children's needs as she should have been, and her home was not clean.  Thus, shortly after Mother began using methamphetamine, in 2005, by her choice, the children began living with Glenda.  Mother saw them sporadically.[3]  According to

---

[3]Glenda had threatened to report Mother to Child Protective Services (CPS) before Mother relinquished the children to Glenda.  CPS still became involved with Mother at that time to some extent.

Mother, placing the children with Glenda at that time was "what was best" for them; she had intended to get her "life back on track." Billy and Heather stayed with Glenda for over two years before beginning to live with Mother again a few months before Adam's birth in 2008.

After taking a long break from using drugs, Mother began using methamphetamine again in 2012, near the time of a failed attempt at reconciliation with Zeth.[4] Mother admits that using drugs around the children endangered them. For months in 2012, Mother used methamphetamine two or three times a day on two or three days per week.

Although still married to Zeth, Mother became engaged to W.P. (Winston) in September 2012—one month after meeting him—and she and Winston used drugs together. They planned on moving from Fort Worth to San Antonio, where Mother had prospective employment and familial support to help her stop using drugs.

One morning in early October 2012, however, just before the planned move, Adam, who was four years old at that time, went outside of the apartment that he, Mother, Winston, and the other children were living in.[5] Mother was

---

[4]Mother, Zeth, and the children lived in New York together. Mother moved with the children back to Texas in February 2012. Zeth and Mother were still married, although separated, at the time of the trial. Mother had not yet divorced Zeth because she wanted to prevent herself from getting remarried and because she did not have adequate finances to do so.

[5]Adam had been outside of the apartment without supervision on multiple occasions.

shopping for groceries at that time, and Winston was asleep. A maintenance worker found Adam unattended and called the police. CPS visited the apartment and removed the children.

On October 8, 2012, the Department of Family and Protective Services (the Department) filed a petition in which it asked to be named the children's temporary sole managing conservator and sought the termination of Mother's parental rights to the children if her reunification with them could not be achieved. To the petition, the Department attached an affidavit explaining that, among other facts, Adam had been found outside of his residence alone and Mother had orally tested positive for using methamphetamine. Mother and Winston temporarily abandoned their plan to move to San Antonio.

The trial court entered an order in which it found that the children's physical health or safety was in danger while they were living with Mother and named the Department as their temporary sole managing conservator. The trial court also appointed counsel to represent Mother. The children began living in foster care.[6]

The Department created and filed a service plan that required Mother to attend Narcotics Anonymous (NA) meetings three times per week, maintain employment to demonstrate an ability to meet the children's financial needs,

---

[6]Glenda testified that she did not take the children upon their October 2012 removal from Mother's care because she did not believe that she could support them financially and because she believed that Mother would "get herself together" quicker if the children remained in foster care.

4

attend parenting classes, take random drug tests, submit to a drug assessment and follow all accompanying recommendations, attend visitation with the children, and participate in individual counseling. The trial court ordered compliance with the service plan.

For the first few months while the children were in foster care, although Mother knew that her parental rights to the children were in jeopardy, she continued to use methamphetamine. In November 2012, while the Department's case remained pending, Mother and Winston moved to Bexar County. Although Mother testified that she left the Fort Worth area because "all [she] knew was drugs" there, she continued to use drugs after the move until late February 2013, when she started a period of sobriety. After becoming sober, Mother began engaging in the tasks required by the service plan.

Neither Mother nor Winston had a job upon arriving in Bexar County, so they lived with one of Mother's friends in an apartment. After Mother's friend left the apartment, Mother and Winston were evicted from it. They "bounced [around] pretty much from different motels, and . . . ended up homeless." For a while, starting in about March 2013, Mother and Winston slept in a box in the woods. At about the end of April or beginning of May 2013, they began living with Glenda.

In June 2013, Mother entered into a three-month lease for a one-bedroom apartment in San Antonio. Around that time, she began working part-time at a

5

restaurant.[7]  Mother explained that she entered into a short-term lease on the one-bedroom apartment so that she could lease a larger apartment if the trial court returned the children to her.  She also testified that the apartment was clean, was located in a safe area, and was close to an elementary school.

The trial court conducted a bench trial in August 2013.[8]  At that time, Mother was working on a number of tasks from her service plan, but she had not completed many of them.  The court terminated Mother's parental rights to the children through a September 2013 order, finding that termination was in the children's best interest and that she had knowingly placed or allowed them to remain in conditions or surroundings that endangered their physical or emotional well-being, had engaged in conduct or knowingly placed them with persons who had engaged in conduct that endangered their physical or emotional well-being, and had constructively abandoned them.[9]  The trial court also terminated Zeth's parental rights to Adam; Michael's parental rights to Billy and Heather had already been terminated based on Michael's voluntary relinquishment.  The court named the Department as the children's permanent managing conservator and

---

[7]In the five years preceding the trial, Mother had worked at several part-time jobs.

[8]Mother filed a motion to extend the statutory dismissal deadline, but the trial court denied the motion and proceeded with a trial a month later.  *See* Tex. Fam. Code Ann. § 263.401(a)–(b) (West 2008).

[9]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (2) (West Supp. 2013).

authorized the Department to seek adoption for the children. Mother brought this appeal.

### The Children's Best Interest

Mother argues only that the evidence is legally and factually insufficient to prove that termination of her parental rights is in the children's best interest. In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re*

7

*J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

In evaluating the evidence for legal sufficiency, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that termination is in the children's best interest. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of Mother's parental rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008).

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *E.N.C.*, 384 S.W.3d at 807; *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors").

**Mother's history of substance abuse**

Mother has a long history of using illegal drugs, including marijuana, cocaine, and methamphetamine. She recognizes that she is a drug addict. She began using marijuana when she was fourteen years old and was still using illegal drugs in her early thirties. Although she had not used marijuana in several years preceding the trial, she had used significant amounts of cocaine and methamphetamine during that time. Mother used methamphetamine while the children lived with her; she testified that she would use the drug while Billy and Heather were at school and while Adam was in daycare. Mother testified that

even while she was high on drugs, she could make decisions to keep her children safe.

Mother's drug use contributed to the children's removal from her care in October 2012,[10] but their removal and placement in foster care did not motivate her to immediately stop using drugs although she knew that her parental rights were in jeopardy. Instead, Mother and Winston used drugs together as late as February 2013, months before the trial. Krystal Tipton, a CPS legal worker, testified that in February 2013, Mother put bleach in a urine sample to attempt to distort drug-test results. Mother then acknowledged, however, that she had been using drugs near that time.

Although Mother professed to having sustained months of sobriety at the time of the trial and although she had passed her most recent drug test,[11] she recognized that she had previously been sober for a long period of time before returning to drug use. She expressed that this period of sobriety would be different because she had learned about her addiction and about techniques to

---

[10]After being sober for a long period, Mother began using methamphetamine again, two or three times per week, in the late spring or early summer of 2012. Mother tested positive for amphetamines and methamphetamines in October 2012.

[11]Mother's most recent hair follicle drug test, from July 3, 2013, returned with a negative result, which indicated that Mother had not used illegal drugs in ninety days preceding the test. Mother admitted, however, that at the time of the trial, she smoked up to five cigarettes per day after having "cut back quite a bit."

prevent a relapse. But as explained below, at the time of the trial, Mother had not completed parts of the service plan aimed at helping her to stop using drugs.

Before the children's removal in October 2012, Mother and Glenda had talked about Mother's possible move to San Antonio with the children; in fact, Mother, the children, and Winston had planned to move there on the weekend that followed the children's removal. At about that time, according to Glenda, Mother acknowledged that her drug problem was reappearing, and she planned to live with a friend who avoided drug use.

Like Mother, Glenda opined that Mother's sobriety at the time of the trial was different from her previous sobriety that preceded her relapse because she had now received drug education and had come to understand that she is an addict. Regarding Mother's commitment to stop using drugs, Glenda testified,

> I believe that her sobriety of five years shows a big commitment. She had a relapse, and this time she has received professional help with that. I think she has a better understanding, and I believe that she will continue to work on that. And I do believe that she knows that if she were to get her children back, that there would not be a second chance.

**Mother's relationships**

Mother has a history of entering into romantic relationships with men who take actions that are not beneficial or appropriate for the raising of children. For example, although Mother testified that she did not use drugs while married to Michael (Billy and Heather's father), she explained that she was the victim of physical and emotional domestic violence from him before becoming divorced.

12

Mother's second husband, Zeth (Adam's father), has a criminal history and a pattern of substance abuse, including using heroin while married to Mother. Mother's fiancé, Winston, is a long-time drug addict. He and Mother used drugs together starting on the day that they met each other.

Mother recognized that she had made a poor decision by allowing Winston to move in with her and the children in September 2012 after she had known him for only about a month. She testified that she had "attempted" to end her relationship with him approximately one month before the August 2013 trial because she believed that CPS and "everybody in [her] life" wanted her to do so. She also testified that as of the time of trial, she did not know whether she was still engaged to him.

Mother testified that she planned on living with Winston if the children were returned to her care. Winston had been living in North Carolina before the trial. He visited Texas at the time of the trial, stayed with Mother in her apartment, and was considering remaining there and working on his service plan if the court returned the children to Mother. Mother did not know whether Winston had obtained a job in North Carolina, but she stated that he had "opportunities there."

Mother stated that she was willing to end her relationship with Winston if the court returned the children to her. She also testified that defeating her drug addiction was more important than her relationship with Winston.

About a month before the trial, Mother told Tyra Sasita, one of the Department's conservatorship workers, that she was "no longer in a relationship"

13

with Winston and that she was "focusing on her children." In fact, during the same month, Mother informed Sasita that Winston was harassing her, that she was afraid of him, and that she believed that he was using drugs again. After hearing Mother's testimony at trial, Sasita believed that Mother had lied about the status of her relationship with Winston. Sasita explained that shortly before trial, Mother had used time in a visit with the children to allow them to speak with Winston on the phone.

**Mother's parenting abilities and evidence that reflects on them**

Mother's criminal history includes a 2005 arrest and a 2013 conviction for theft. With regard to Mother's October 2012 theft offense, she pled guilty in February 2013, was convicted, and received a sentence of two days' confinement. Mother admitted that when she becomes "stressed out," she tends to resort to shoplifting and drugs.

Mother testified that based partly on her income from part-time jobs and partly on others' help (including government assistance), she could provide for the children financially if the trial court returned them to her. But during the pendency of the case in the trial court, Mother had an unstable lifestyle, including being evicted from an apartment, bouncing from one motel to another, and living in a box. Although Mother did not know precisely how much money she had saved at home, she believed that it was between $100 and $200.

In addition to working at a restaurant and with a lawn service at the time of the trial, Mother made up to $55 per week by selling plasma. Winston also sold

14

his plasma. But after the children's removal and placement in foster care, Mother did not provide money to help care for them. Similarly, in the more than two years that the children lived with Glenda because of Mother's drug use, Mother did not financially support them.

At the time of the trial, Mother did not have health insurance for herself, and her children were on Medicaid. Mother was receiving food stamps until the children's removal from her care in October 2012, and she planned to apply for food stamps again if the children were returned to her.

Mother testified that "to [her] knowledge," she had a valid driver's license at the time of the trial. But the record indicates that Mother did not have a car to transport the children; she testified that she had sold one in March 2013 for $440 to obtain funds for housing and that she had been traveling by bus and by bicycle.

Mother testified that "[a]t times," she had demonstrated an ability to be a good parent to the children, but she acknowledged that there had been significant amounts of time when she had not been a good parent for them. At one point in the trial, Mother conceded that she was not ready to care for the children. She asked for an "extension to continue proving [herself] to the Court." At another point, however, Mother asked for the children to be returned to her.

Mother testified that while the children lived with her, they made excellent grades in school, and school personnel never expressed concerns about them to her. She also stated that she always provided appropriate food and clothing for

15

the children.  According to Mother, the children were never in physical danger while living with her in Fort Worth, and she and Winston had a bond with them.

Sasita opined that the children would be in danger physically or emotionally if the trial court returned them to Mother.  Specifically, Sasita explained,

> [Mother] has not demonstrated the stability that would be needed . . . in order for CPS to recommend a return home. There are recommendations by the therapist that suggest that there's more work that needs to be done on the part of [Mother].
>
> The Department is concerned in regards to the relationship with [Winston], a person that has not completed the service plan, that has not been in contact with the Department, [and] that does not at this time seem willing to be an appropriate caregiver for the children.

Sasita also explained that Mother's past showed "that she [could] keep it together for a little while and then something [would] happen[]."

Sasita recognized that the children are polite, attractive, smart, and healthy, and she conceded that some of those qualities "could be" attributed to Mother's parenting.  Glenda described Mother as a "very good" parent. According to Glenda, Mother is a meticulous housekeeper, is very attentive to the children, and is active in disciplining them.  Glenda testified that although Mother stubbornly refused to ask her for help upon moving to San Antonio and lived in a box awhile, she eventually realized that she wanted a better life, changed her attitude, and began to work on her service plan.

16

Glenda testified that she would be willing to help Mother financially and in caring for the children if the trial court returned them to Mother. She also expressed her belief that Mother's top priority was keeping her children and that Mother had the ability to take excellent care of them. She said that other than in "the drug times," Mother has always been a good parent to the children. Glenda also said that the children love Mother.

**Mother's and Winston's failures to complete their service plans**

Tipton, Mother's CPS caseworker in Bexar County, testified that she referred Mother to services aimed at achieving her reunification with the children. According to Tipton, Mother completed a counseling intake and began counseling, but Winston was discharged from counseling due to sporadic attendance. Although Mother had been assigned to attend ten counseling sessions on a one-per-week basis, she had not done so regularly. In fact, in the six months before the trial began, Mother had completed only approximately eight sessions. She explained that transportation problems precluded her attendance at some sessions.

Similarly, Mother completed a drug assessment only shortly before trial, so she had started but had not completed the recommendation generated from the assessment, which was a six-week series of hour-long recovery classes. Mother testified that the classes were "setting a good foundation" for her ability to remain sober.

17

Tipton testified that Mother had not otherwise engaged in any formal treatment for her drug abuse except, according to Mother, attending some NA meetings.[12] Mother stated that since the removal of her children in October 2012, she had attended only eleven NA meetings. Mother testified that she did not attend any NA meetings from October 2012 until June 2013 because she "wasn't ready to."

According to Tipton, of all the services that CPS required Mother to complete, she had finished only one: an "empowerment class" that required only two sessions of ninety minutes each. Tipton testified that Mother was engaging in the services at the time of the trial but that she had waited until the "tail end" of the case to do so. At the time of the trial, neither Mother nor Winston had completed all of the required parenting classes.

Tipton attempted to visit Mother's apartment the day before the trial, but Mother told Tipton that she was unavailable because it was her birthday and she had other plans. Mother finally sent Tipton a text message late at night to tell Tipton that she had made it home and that Tipton could visit the apartment. Mother's contact with Tipton was sporadic.

Glenda stated that Mother had difficultly completing some services because part of the information that CPS had given to Mother about the services was incorrect. Sasita recognized that at the time of trial, Mother was making

[12]Mother did not provide sign-in sheets to Tipton to verify her attendance at these meetings.

progress and was "actively engag[ed]" in completing her service plan by, for example, finding employment in Bexar County and obtaining housing after being homeless. But Sasita indicated that Mother did not become truly interested in completing the service plan until May 2013, which was several months after the children's removal.

CPS scheduled two-hour visits between Mother and the children for every two weeks at the CPS office. Mother attended all visits from October 2012 until February 2013, and Winston went to most of the visits with Mother. But for various reasons, Mother missed some visits with the children in March, April, May, and July 2013.

Mother testified that she and Winston insisted on CPS's creation of a service plan for Winston even though none of the children were biologically his because he planned on being a part of their lives. But Mother recognized that Winston had completed only one part of the plan, and she acknowledged being concerned by his lack of completion of other services.

Mother stated that she had learned in counseling that she is a procrastinator, that she tends to have a negative focus, that she does not like being criticized, and that she makes excuses to "justify things." During parenting classes (which Mother had started near the time of the trial but had not completed), Mother learned about new discipline techniques for the children and about how to encourage them to develop their self-esteem.

Mother conceded that she had been told upon the children's removal in October 2012 that she needed to complete her service plan as soon as possible, that she did not do so, and that she instead waited until the spring of 2013 to make significant progress on the plan. Mother testified that she did not begin working on the service plan sooner because she was "not ready" to do so.

Sasita testified that after she developed Mother's service plan, she reviewed the plan with Mother. Sasita explained that Mother had not attended three NA meetings per week as required by the plan and that Winston had not provided any NA sign-in sheets although his service plan had likewise required him to attend NA three times per week. In noncompliance with their service plans, Mother and Winston had also not maintained steady employment, had not maintained appropriate and safe housing (they were homeless awhile during the Department's case), had not refrained from criminal activities (because they had used illegal drugs), and had not attended all visits with the children.

Sasita testified that although Mother's counselor had recommended Mother's participation in outpatient drug treatment, Mother had not followed the recommendation because she did not "feel that she need[ed] that." According to Sasita, it had been "[a]bsolutely" possible for Mother to complete all of the requirements of her service plan between the children's removal in October 2012 and the August 2013 trial.

**The Department's plans for the children**

Mother conceded that Adam would be well-cared for in his proposed adoptive home, which was with his paternal grandmother (Zeth's mother). Adam's grandmother testified that she had been caring for Adam for a month preceding the trial and that she could provide Adam a safe environment to live in. Adam's grandmother testified that Adam had stated that he missed Mother, who had called him on the telephone once per week while he lived with his grandmother. She also stated that she would have supported giving Mother more time to complete her service plan so that Mother and the children could be reunited. Finally, she stated that Adam was adjusting well in her home, that he had been receiving a lot of individual attention, and that she would be willing to continue his relationship with Billy and Heather.[13]

Sasita testified that Adam was doing "really well" while residing with his paternal grandmother. She also stated that Billy and Heather were progressing well in foster care. Although Billy and Heather's foster family was not interested in adopting them, at the time of the trial, the Department had identified a stable proposed adoptive home for both of them. Visits between Billy, Heather, and their proposed adoptive home had "gone very well." Sasita testified that the children and their prospective adoptive families would be eligible to receive postadoption services, including counseling.

---

[13]Similarly, Billy and Heather's proposed adoptive home was willing to maintain their relationships with Adam.

21

**The trial court's best interest finding**

Based on all of the evidence in the record, we conclude that the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28. A factfinder could have rationally weighed some of the evidence (such as Mother's bond with the children and her sobriety at the time of trial) in favor of returning the children to Mother or giving her more time to sustain her sobriety and to complete her services. But considering the evidence cumulatively under the relevant factors, we conclude that the trial court could have reasonably based its best interest finding on, among other facts, Mother's history of using a variety of illegal drugs, including doing so months before the trial and at times when she was responsible for caring for the children; her pattern of engaging in relationships with men who committed illegal acts, such as using drugs; her apparent reluctance to end her relationship with Winston although he was addicted to drugs, was harassing her, and had not significantly progressed on his service plan; her unstable financial and housing circumstances during the time that the children were in foster care; her failure to complete her service plan or to work diligently on it in the first few months that the children were in foster care even though many of the services were aimed at ending her substance abuse; and the children's stability that could be achieved through their planned adoptions. *See Holley*, 544 S.W.2d at 371–72; *In re J.N.H.*, No. 02-11-00075-

22

CV, 2011 WL 5607614, at *8 (Tex. App.—Fort Worth Nov. 17, 2011, no pet.) (mem. op.) (considering a parent's criminal and drug histories in affirming a trial court's decision that termination was in the best interest of a child); *In re K.W.*, No. 02-07-00458-CV, 2008 WL 2639037, at *4 (Tex. App.—Fort Worth July 3, 2008, no pet.) (mem. op.) (holding that clear and convincing evidence existed that termination of a father's parental rights was in a child's best interest when, among other factors, the father had a pattern of criminal conduct and drug abuse); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with [a] family service plan support a finding that termination is in the best interest of the child.").

We hold that the evidence is legally and factually sufficient to clearly and convincingly prove that termination of Mother's parental rights is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28. Thus, we overrule Mother's only issue.

## Conclusion

Having overruled Mother's sole issue, we affirm the trial court's judgment of termination.

/s/ Terrie Livingston
TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

DELIVERED: March 6, 2014

23